UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

TOM TRAINI,                      )
                  Petitioner,    )        Case No. 1:07-cv-80
                                 )
v.                               )        Honorable Robert J. Jonker
                                 )
CINDI CURTIN,                    )
                                 )        **REPORT AND RECOMMENDATION**
                  Respondent.    )
_____ )

　　　　This is  habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving five concurrent felony sentences, all arising from his alleged procuring

of the abduction of Kelly Ray Allen in Genesee County, Michigan on November 1, 2002.

Petitioner's convictions arise from a no-contest plea entered in the Genesee County Circuit Court

on June 10, 2003, pursuant to a plea agreement.  Petitioner is serving concurrent sentences of 15-to-

30 years' imprisonment on his plea-based convictions for conspiracy to commit kidnaping, MICH.

COMP. LAWS §§ 750.157a, 750.349; kidnaping, MICH. COMP. LAWS § 750.349; armed robbery,

MICH. COMP. LAWS § 750.529; and car-jacking, MICH. COMP. LAWS § 750.529a, in addition to a

concurrent sentence of 13-1/2-to-20 years' imprisonment for first-degree home invasion, MICH.

COMP. LAWS § 750.110a(2).  After unsuccessful attempts to challenge his conviction and sentence

on direct appeal and collateral review, petitioner brings this habeas corpus action.

　　　　The amended, *pro se* habeas corpus petition and supporting brief raise the following

four grounds for relief:

I.      THE TRIAL COURT ABUSED ITS DISCRETION BY NOT PERMITTING
        PETITIONER TO WITHDRAW HIS PLEA AFTER SENTENCING
        WHERE THE PLEA WAS NOT KNOWING AND VOLUNTARY DUE TO
        A LACK OF UNDERSTANDING OF THE ENGLISH LANGUAGE.

II.     PETITIONER IS ENTITLED TO RESENTENCING WHERE THE TRIAL
        COURT ERRONEOUSLY SENTENCED ON THE BASIS OF
        INACCURATE INFORMATION WHEN SCORING THE GUIDELINES,
        AND WHERE PETITIONER WAS SENTENCED OUTSIDE OF HIS
        GUIDELINES ON COUNT V, HOME INVASION-1ST.

III.    PETITIONER'S SENTENCE SHOULD BE SET ASIDE WHERE HIS
        ATTORNEY RENDERED CONSTITUTIONALLY INEFFECTIVE
        ASSISTANCE AT SENTENCING, WHERE THERE IS A REASONABLE
        PROBABILITY THE OUTCOME WOULD HAVE BEEN DIFFERENT.

IV.     APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
        MERITORIOUS ISSUES ON DIRECT APPEAL, WHERE SUCH ISSUES
        WOULD HAVE HAD A HIGH PROBABILITY OF HAVING HIS APPEAL
        GRANTED, THEREFORE DENYING PETITIONER OF HIS SIXTH
        AMENDMENT RIGHT TO COUNSEL ON APPEAL.

(Amended Petition ¶ 14, docket # 6). Respondent has filed an answer (docket # 13), supported by

the state-court record, asserting that ground I is meritless and that grounds II through IV are barred

by the doctrine of procedural default. Upon review of the state-court record, I conclude that all four

grounds for relief are devoid of substance and recommend that the petition be denied on its merits.

### Proposed Findings of Fact

        The state-court prosecution arose from the invasion of Kelly Allen's home and his

abduction on November 1, 2002, in the City of Mt. Morris, Michigan. The prosecutor's theory was

that petitioner (the father of one of Allen's stepchildren) hired co-defendants Danette Haney, Deloise

Brodie, and Rory Dixon, Sr. to kidnap Allen and bring him to petitioner's house. This led to the

issuance of a criminal complaint against all four defendants for conspiracy to kidnap, kidnaping, armed robbery, car-jacking, and first-degree home invasion.

## A.    Preliminary Examination

Because the case was resolved by pleas entered by all defendants, the transcript of the preliminary examination contains the only sworn testimony in support of the charges against petitioner.  The preliminary examination was conducted before Judge Mark C. McCabe in the 67th District Court, beginning December 26, 2002.  The transcript of the examination (PE) is reflected in the record in volume 1 (docket # 20) and volume 2 (docket # 21).  Petitioner was represented on the first day of the preliminary examination by appointed attorney James Zimmer.

The prosecution's first witness at the preliminary examination was the victim, Kelly Ray Allen.  On November 1, 2002, Allen lived in a home on Lincoln Road in Mt. Morris, Michigan, with his wife Julie.  Also living in the home were three children of Julie Allen:  A. (a 14-year-old girl), T. (an 11-year-old boy), and J. (a 4-year-old boy).  Petitioner, Tom Traini, was J.'s biological father.  (PE 1, 7-8).  Kelly Allen was acquainted with petitioner as the ex-boyfriend of Allen's wife and the father of her child, J.  (PE 8).  Petitioner had been to the house a few times to pick up his son, and Allen had spoken to him a couple of times on the phone.  (PE 9).  In addition, Allen testified that for eight or nine months petitioner had been following the family and showing up in parking lots whenever they went to the store.  Petitioner also had made threatening remarks to Julie Allen.  (PE 9-10).  From these incidents, Kelly Allen came to recognize petitioner's vehicle as a green 1996 Blazer with tan stripes on the bottom.  (PE 9).

At about 6:30 p.m. on November 1, 2009, a white female came to the door of Allen's home. The 14-year-old girl, A., answered the door. The woman asked to use the phone. A. told her to hold on and that she would get the phone for her. As this was occurring, Kelly Allen was on his way to the bathroom and he just continued on. As he got in the bathroom, he heard "Hit the floor, m-----f-----," and saw defendants Danette Haney and Rory Leon Dixon, Sr. entering the bathroom. (PE 19). They told him to come out into the living room. They wanted to know where Mike and Wayne were, because these two individuals "owed their boss some money." (PE 19). Thinking that this was a robbery, Allen took money out of his pocket, handed it to them, and asked them to just take the money and leave. They did not want the money. Instead, Haney began duct-taping Allen's arms behind his back. Then Dixon took over and duct-taped Allen's eyes and mouth as well. (PE 20). The intruders kept asking where Mike and Wayne were, but Allen said that he didn't know. Before his eyes were taped shut, Allen had seen defendant Deloise Brodie with a silver handgun, which he had pointed at Allen's face. (PE 20-21).

The intruders retrieved the two boys from the bedroom and applied duct tape to them as well. (PE 22). They told the children not to call the police or else they would kill Kelly Allen. They then dragged him out the back door, "beat the hell" out of him and threw him in the trunk of his own car. (PE 25-28).

The intruders drove away. Allen began to work to take the duct tape off and was ultimately able to free his hands. He tried to break the trunk lock with a four-way wrench, making noise in the process. A female voice told him to stop, and a male voice threatened to kill him if he continued making noise. (PE 29). Allen ultimately found a pair of pliers and was able to dismantle the trunk latch, allowing him to jump out of the moving vehicle. He was dragged for about 35 feet

-4-

by a wire, but then freed himself. (PE 30-31). He ran to a gas station and demanded that the attendant call the police. (PE 30-31). Allen waited outside for the police. About a minute later, he saw petitioner and defendant Haney drive by slowly. A couple of minutes later, he saw them drive by again and took down the license plate number. Petitioner and Haney were in a 1996 green Blazer, which Allen identified as belonging to petitioner. (PE 31-32). Then the police arrived.

Allen testified that the only person he had ever seen before was petitioner and that he had never seen the intruders before. (PE 36). After thorough cross-examination by counsel for all defendants, the preliminary examination was adjourned for a matter of weeks.

The preliminary examination resumed on January 22, 2003. By that time, defendants Danette Haney and Rory Dixon had entered into plea agreements with the prosecutor, pursuant to which they agreed to testify against petitioner and Deloise Brodie. Additionally, by the time the preliminary examination recommenced, petitioner had retained a different attorney, Kenneth Karasick.

The prosecution's first witness at the resumed preliminary examination was co-defendant Danette Haney, who identified herself as a 35-year-old prostitute and heroin and crack cocaine addict. (PE 117). She acknowledged her agreement to plead guilty to all charges against her in exchange for an agreed minimum sentence of no less than 5 years or no greater than 15 years. (PE 84-85).

Haney testified that she knew petitioner because he was one of her "tricks." (PE 86-87). She received a call from petitioner, who said he wanted to see her and to speak to her about a job that needed to be done. (PE 90-91). This was one or two weeks before the home invasion. (PE 86). The next substantive communication took place in petitioner's Blazer, with Haney's boyfriend

Deloise Brodie, and Rory Dixon, Brodie's friend. Petitioner said that someone owed him money for drug transactions and that he wanted that person brought to him. The person's name was Kelly. Petitioner identified Kelly as a "squirrely dude" and told the others to cut Kelly's throat if necessary. (PE 92). The four met the next day at petitioner's house, where petitioner drew a diagram of the victim's home. Petitioner promised to pay $1,500.00 and "some dope" which would be split among Haney, Brodie and Dixon. (PE 93-94). The plan was that petitioner would drop the three off near Kelly's house so that they could go in and "deliver Kelly." (PE 95).

One week later, petitioner picked up Haney, Brodie, and Dixon in his Blazer. They first stopped at the Dollar Store to get gloves, box cutters, and tape for their use in restraining Kelly. (PE 95-96). The plan was to transport Allen to petitioner's house in Allen's own car. Petitioner would then be waiting for the others with their cash. (PE 97-98). Haney testified that she thought Kelly would be back home within the hour, after petitioner "talked to him." Petitioner instructed her to also ask for Wayne and Mike, because he wanted to talk to them as well. (PE 98). Petitioner's instructions, however, were only to take Kelly at that time. (PE 99).

Petitioner dropped the three off about a block from Kelly Allen's house. Haney knocked on the door. A teenage girl answered the door, and Haney asked to use the phone because her car had broken down. The girl invited Haney in and handed her the phone. Then co-defendants Brodie and Dixon came in the house behind Haney. (PE 99-100). In addition to the girl, a 12-year-old boy and a 4 or 5-year-old boy were also in the house. Dixon and Brodie told them all to get down on the ground. (PE 100-01). Haney then began to tie up Kelly with duct tape. Haney testified that it was her assignment to tie everybody up and that Brodie was "to keep control of everything." (PE 102). She confirmed that Brodie had a handgun, in addition to the box cutters that the group had

purchased at the Dollar Store. (PE 103). She testified that Brodie brandished the weapon and that he roamed around the house looking for things to take. He took a boombox and was looking for other things as well. (PE 103-04).

Dixon found Allen's car keys. Haney took the keys and went outside. She pulled the car to the sliding glass door in the back of the house and opened the trunk. (PE 112-13). She and Dixon grabbed Kelly Allen and put him in the trunk. (PE 113). The victim started to scream, so Haney hit him in the head with a phone and then shut the trunk. She drove the car away from the house, with Brodie in the front seat and Dixon in the back seat. She began to drive towards Corunna Road, towards petitioners' house. (PE 114).

While driving to petitioner's house, Haney heard Dixon say that Kelly Allen was out of the trunk. She panicked and turned the corner, and they all jumped out of the car. By that time, Allen was gone and the three went their separate ways. (PE 115). She and Brodie found each other and decided to call petitioner at the Colonial Restaurant, where he had picked them up in his green Blazer. Petitioner showed up at the scene, and she and Haney got into his Blazer. Haney was in the front seat and Brodie in the back seat. (PE 115-16). Petitioner brought them back to Allen's car, and he told Haney to follow him, but she lost him. (PE 116). Ultimately, at petitioner's direction, Haney, Brodie and Dixon doused Allen's car with charcoal lighter fluid and burned it. (PE 116-17). Petitioner instructed Haney that if she were ever questioned by the police she should blame a man named Wayne. (PE 117).

After Haney was cross-examined, the prosecution called Rory Leon Dixon as a witness. Dixon testified that he had reached a plea agreement pursuant to which he would plead guilty to all charges in exchange for a minimum sentence of between 5 and 15 years. (PE 143-44).

Dixon did not know petitioner before this time, but was brought into the project by Danette Haney and Deloise Brodie. (PE 145-46). Dixon provided detailed corroboration of Danette Haney's testimony. He first met petitioner on the day of the event. Petitioner said that "the guy" owed him money and that he wanted to talk to him, but no one was going to get hurt. (PE 146-47). The place of that meeting was petitioner's green Blazer. The agreement was that Dixon, Brodie and Haney would be dropped off near Allen's house, Haney would knock on the door and ask to use the phone, and then the others would go in. (PE 147-48). The remainder of Dixon's testimony corroborated Haney's recitation of the events that took place while the three were in the victim's house and thereafter.

At the end of the preliminary examination, Judge McCabe found probable cause to bind both petitioner and Brodie over on all five felony charges arising from the armed robbery and kidnaping of Allen, the car-jacking, and the first-degree home invasion. In addition, the court found probable cause to bind Brodie over on a charge of possessing a firearm during the commission of a felony and possession of a firearm by a convicted felon. (PE 175-180).

### B.     Pretrial Proceedings

All further proceedings took place in the Genesee County Circuit Court, Judge Judith A. Fullerton presiding. Petitioner, accompanied by attorney Karasick, was arraigned on five felony charges before the circuit court on February 3, 2003. A plea of not guilty was entered. (Arraignment Transcript, docket # 22).

On February 21, 2003, counsel appeared before the circuit court for hearing on certain motions. During the hearing, defense attorney Karasick moved for a referral of his client to the

Forensic Center for a competency evaluation. In support of the request, he told the court that petitioner (a Jordanian) does speak English but was having a language problem. He further informed the court that petitioner was threatening suicide and was hearing noises. (Motion Transcript, docket # 23, at 4). The court returned to the language problem, asking whether petitioner's problems had to do with language. Mr. Karasick answered, "No, no, I mean, we have a little trouble conversing, but no . . ." (*Id.* 5). The court then addressed petitioner directly. Speaking English, petitioner informed the court that he had undergone prior psychiatric treatment. (*Id.* 6). Petitioner informed the court that he felt like he wanted to kill himself and felt lonely all the time. He also informed the court that he had stopped taking his medication. (*Id.* 7-8). After conversing with petitioner, the circuit judge agreed to sign an order of commitment for a forensic examination on both competency and criminal responsibility. (*Id.* 9-10).

Petitioner next appeared before the court on April 11, 2003. (Transcript, docket # 24). The court noted its receipt of a report from the Center for Forensic Psychiatry. (Tr. 3). Both attorneys expressed their willingness to submit the competency issue to the court on the basis of the report alone. (Tr. 4). The court noted that the examiner found petitioner competent to stand trial. In response to a question by the court, petitioner stated that he understood the report. (Tr. 4). The court signed an order finding petitioner competent to stand trial.

Defense counsel Karasick moved to withdraw as petitioner's counsel, pronouncing himself ethically unable to proceed. (Tr. 5). Mr. Karasick suggested that the court appoint attorney James Zimmer, who had represented petitioner at the first day of the preliminary examination. (*Id.* 5). In response to a question from the court, petitioner said that he did not know what to do but that he wanted to have a lawyer. (*Id.* 6). Mr. Karasick stated it was petitioner's contention that he had

nothing to with the crimes, even though the other three people had pled guilty and had agreed to implicate petitioner. (*Id.* 7). The court granted defense counsel's motion to withdraw and indicated its willingness to appoint counsel if petitioner qualified financially. (*Id.* 9-10). In this hearing, as in the previous hearings, petitioner participated without the help of an interpreter and addressed the court in English.

Petitioner appeared before Judge Fullerton on April 17, 2003, accompanied by attorney James Zimmer. (Motion Transcript (MT), docket # 25). Mr. Zimmer indicated that he was still in the process of reviewing files and talking to the other attorneys in the case. (MT 4). Judge Fullerton informed counsel that she had received a letter from petitioner stating that he needed to have an interpreter. The judge indicated that "it sort of surprised me after we have gone through the whole district court, he has retained two English-speaking counsel[, and] who has never had any trouble in the courtroom that led me to believe that he had any problem understanding English." (MT 5). Attorney Zimmer informed the court that he really did not have any trouble understanding petitioner and that "he and I seem to communicate fairly well." Petitioner volunteered, "You're right." (MT 5). Mr. Zimmer informed the court, however, that petitioner said that sometimes when proceedings are going on and people are talking fast, he doesn't understand. "It may be helpful to have him understand the witnesses, but as far as, you know, taking time to communicate with him, I don't have any problem there, Judge." (MT 5-6). The court requested that defense counsel let her know as soon as possible if an interpreter were needed, because of the difficulty of obtaining one on short notice. The court then had the following colloquy with petitioner.

Now, are you still telling me, Mr. Traini, you want an Arabic speaking interpreter to assist you in these proceedings?

THE DEFENDANT: Your Honor, you know, the only thing like the law things, you know, some law things, you know, I never hear about it what mean, you know, but like conversation, you know, with anybody I can talk, you know, I understand, you know, . Some things --

THE COURT: Legal meaning.

THE DEFENDANT: Yeah, you're right and --

THE COURT: Well, can't your lawyer explain the legal meanings --

THE DEFENDANT: He never, he never and he never gave me a --

THE COURT: This lawyer.

THE DEFENDANT: Oh, my lawyer, yeah, he explain, you know, like he talk to me like slow, you know, and he understand me, you know.

The other lawyer he did not give me a piece of paper until now, you know, that day he lie in front of you, you know, he make me just -- just stop talking and his hands, he said, you know, like that --

THE COURT: He thought you shouldn't talk in the court because you might say something that would --

THE DEFENDANT: I'm sorry --

THE COURT: -- what we call incriminate yourself.

THE DEFENDANT: I'm sorry, your Honor --

THE COURT: That's the reason he didn't want you to talk.

THE DEFENDANT: Okay, I'm sorry, your Honor.

THE COURT: So there are reasons sometimes that lawyers don't want their clients to say things.

THE DEFENDANT: That's fine, I'm sorry, your Honor.

(MT 6-8).

C.      **No-Contest Plea**

The circuit court convened on June 10, 2003, at 10:00 a.m. for purposes of conducting a jury trial. At the outset of proceedings, defense counsel Zimmer told the court that it would not be necessary to empanel a jury, because the matter had been resolved. (No Contest Transcript (NCT) at 3, docket # 28). Judge Fullerton remarked that an Arabic translator was present to interpret the proceedings for petitioner. (NCT 4). Attorney Zimmer informed the court that the interpreter, Mike Kamal, had been interpreting for petitioner and counsel earlier that day, during which the negotiated plea had been explained to petitioner. The court then had this exchange with the interpreter:

> THE COURT: Okay. But I guess I'm going to ask Mr. Kamal then, do you think I should have you translate everything I say into -- is it Arabic or what is it?
>
> MR. KAMAL: It's Arabic, yes, your Honor.
>
> THE COURT: Arabic, regular Arabic, and have him tell you in Arabic the answers back, or can he understand me?
>
> MR. KAMAL: I think he can understand most of the English, just like Mr. Zimmer said, sometimes if things go a little bit faster for him, it's a little bit too hard to understand.
>
> THE COURT: Would you be able to tell Mr. Traini right now as we start that if there is anything at all he doesn't understand he can tug on your sleeve or raise his hand or do anything and let you know and then we will stop and have you translate into Arabic anything either Mr. Riggs, Mr. Zimmer or I say, is that a system --
>
> MR. KAMAL: Yes, your Honor --
>
> THE COURT: Well, tell Mr. Traini that, how -- that's how we'll do it.

(NCT 4-5). The court asked petitioner whether that system would work. Petitioner answered, "Your Honor, I understand English, but some words about the law, you know, I don't understand it, you know, that's why, you know, I asked for this." (NCT 6). The court urged petitioner to tell Mr.

Kamal if there were something he did not understand and assured him that "we're going to stop and have him translate." (*Id.*). Petitioner responded that he would do that. The court placed the interpreter under oath. (*Id.*).

The court then proceeded to take petitioner's plea. The assistant prosecutor tendered to the court a signed plea agreement, and petitioner acknowledged his signature. (NCT 7). The assistant prosecutor placed the substance of the plea agreement on the record. Petitioner agreed to plead no-contest to all charges, justifying the no-contest plea on the basis of his concern about civil liability. (NCT 10-11). In exchange for the plea, the parties agreed that the minimum sentence would be 15 years on the life offenses (kidnaping, conspiracy to commit kidnaping, armed robbery, and car-jacking). On first-degree home invasion, the parties agreed that the minimum sentence would not exceed 13 years 6 months. Further, the People would recommend to the court that all sentences run concurrently and that the court not exercise its authority to have the car-jacking and home-invasion sentences run consecutively. Both parties further requested that the court enter into a so-called "*Cobbs* agreement," which Judge Fullerton indicated she would accept, but with reluctance.[1] Finally, the prosecutor agreed not to charge petitioner with other crimes related to this incident, including charges of subornation of perjury. (NCT 11-13).

---

[1] In *People v. Cobbs*, 505 N.W.2d 208 (Mich. 1993), the state supreme court held that the sentencing judge may state on the record the length of sentence that, on the basis of information then available, appears to be appropriate for the charged offense. 505 N.W.2d at 212. If the sentencing judge refuses to impose that sentence in accordance with the initial assessment, defendant must be given the opportunity to withdraw the plea. *Id.* In 2005, the Michigan Court Rules were amended to codify the requirements of the *Cobbs* case. MICH. CT. R. 6.310(B)(2). Hence, a *Cobbs* agreement is similar to a plea in federal court under Fed. R. Crim. P. 11(c)(1)(C), under which the prosecutor may enter into a binding plea agreement with a defendant. The only difference is that in the Michigan courts, the sentencing judge may also be a party to the agreement. In either case, however, defendant must be given the right to withdraw the plea if the court does not sentence in accordance with the agreement.

The court stated on the record the effect of a no-contest plea, under which the defendant would be sentenced as if he had entered a guilty plea. Defense counsel confirmed that he had explained the concept to his client. (NCT 14). Turning to petitioner, the court asked whether he understood that concept, to which petitioner answered, "Yes, I do understand."

The court then began the plea colloquy, in which it addressed petitioner personally, and petitioner answered in the English language, without translation by the interpreter. The court placed petitioner under oath for purposes of the plea colloquy. (NCT 17). Petitioner acknowledged his understanding of each of the five charges and said that he understood that conspiracy to commit kidnaping, kidnaping, armed robbery, and car-jacking were all punishable by a maximum possible prison sentence of life. He also stated that he understood the maximum possible prison sentence for first-degree home invasion was 20 years. (NCT 17-18). The judge then expressed her willingness, with reluctance, to allow all sentences to run concurrently and asked whether petitioner understood. Petitioner answered, "Yes, ma'am, I do." (NCT 19).

The court then reviewed with petitioner the rights that he would give up by pleading guilty, including the right to a trial, the right to confront and cross-examine witnesses, the right to be presumed innocent, and the right to call witnesses to appear at trial. Petitioner expressed his understanding of each of these concepts, always addressing the court in the English language. (NCT 19-21).

At only one point during the court's colloquy concerning trial rights did petitioner express any confusion, necessitating help from the interpreter:

THE COURT: You're giving up your right to testify, do you understand that?

THE DEFENDANT: Yes.

-14-

THE COURT:  Because there will not be a trial if I accept your pleas today, do you understand that?

THE DEFENDANT:  I do understand, but when they testify me, you know, what I am gonna answer, you know.  You know, 'cause my answer is going to be like, you know, I did this, I did that, you know for the jury or for people --

MR. ZIMMER:  No, no, no, it doesn't make any difference what you're saying --

THE DEFENDANT:  Yes.

MR. ZIMMER:  You have the right to do that and you're giving it up.

THE DEFENDANT:  That's fine, yeah.  I be telling the truth no more.

THE COURT:  Let me try it again.  I want a clear waiver of this right, this is a critical trial right and I have to have a clear understanding if -- Mr. Kamal, do you think he understands, why don't you talk to him, see if he understands this right to testify.

(Interpreter, counsel and defendant conferring)

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Now, let's try.  Mr. Kamal, do you think he understands the right?

MR. KAMAL:  It [sic] think he said that he would give up all those rights.

THE COURT:  All right.  I just want to go over this last one now, one more time, I'm going to try it.  You have the right to testify at the trial if you wanted to, but you are giving it up by entering your pleas today, do you understand?

THE DEFENDANT:  I do understand, your Honor.

THE COURT:  And this is what you wish to do, is that correct?

THE DEFENDANT:  Yes, your Honor.

(NCT 22-23).

The court covered the question of promises outside the plea agreement, and petitioner responded, always in English, there were no such promises. (NCT 23-25). During this colloquy, petitioner expressed some confusion concerning which attorney the court was referring to (his present attorney, Zimmer, or his previous attorney, Karasick). (NCT 24-25). The court asked the interpreter to make sure petitioner was not relying on anything anybody had told him that was not on the record. (NCT 25). After defense counsel and the interpreter conversed with petitioner, the court returned to the issue:

THE COURT: Everything is on the record, is that correct now, Mr. Traini?

THE DEFENDANT: Correct, your Honor.

(NCT 26).

The court asked for petitioner's plea on each charge separately. In response to each charge, petitioner stated that he wished to plead "no contest." He also told the court that it was his own choice to enter each plea. (NCT 27-28).

The assistant prosecutor placed a lengthy factual basis on the record, quoting extensively from the preliminary examination transcript. (NCT 28-40). The court received the entirety of the preliminary examination transcript as a basis for finding defendant factually guilty of each of the five felonies with which he was charged. (NCT 40-41).

Again addressing petitioner directly, Judge Fullerton asked whether he wanted the court to accept the five no-contest pleas, to which petitioner answered, "Yes, your Honor." The court then made the following factual findings:

THE COURT: All right, I will accept these five pleas of no contest as indicated and find they have been made understandingly, voluntarily, accurately and knowingly. And reading from the guilty plea cases at 395 Michigan 96, at 134,

where the Michigan Supreme Court has set forth various circumstances which justify trial judges to take pleas of no contest which is a departure from the norm of direct questioning, and among those justifying circumstances are, a desire to minimize other repercussions such as civil litigation. Because of that, the Court will agree to accept the pleas of no contest.

The pleas having been made understandingly, voluntarily, accurately, and knowingly, I'll ask the attorneys are there any other promises, threats or inducements of any type that have not been placed on the record, Mr. Riggs?

MR. RIGGS: There have been none other than what have been placed on the record here in open court, Judge.

THE COURT: Mr. Zimmer?

MR. ZIMMER: I agree, Judge.

(NCT 40-41).

## D.    Sentencing

Petitioner appeared with counsel for sentencing on July 14, 2003. (*See* Sentencing Transcript (ST), docket # 29). Mr. Kamal, the interpreter, was present and was sworn at the outset of the proceedings. (ST 3). The court noted the portion of the presentence investigation report that reflected petitioner's denial that he ever had any contact with the co-defendants. The court asked petitioner "where we are going today with the case." Petitioner then began speaking in Arabic, professed not to understand what was going on, and said that he did not know about the law. (ST 4-5). The court stated that if petitioner professed his innocence, the case would proceed to trial. (ST 5). The court observed that "we do not play games with this court and plead no contest and then come in and say, I don't know anything about it, I have never met all these people." (ST 6). Petitioner continued to express his confusion. The court reminded him that he had entered a no-contest plea and that he had told the court that he understood the proceeding. (ST 6-7). Defense

-17-

counsel assured the court that his client understood everything and that he wanted to proceed. (ST 8-10).

The court then heard objections to the guideline scoring and heard allocution from all parties. (ST 17-22).

The court then made findings relevant to sentencing, but ultimately remarked that sentence was being imposed pursuant to the "recommended plea." (ST 24). The court imposed the sentences agreed upon at the no-contest plea hearing pursuant to the *Cobbs* procedure. (ST 24-25).

### E. Direct Appeal and Application for Post-Conviction Relief

Petitioner requested the appointment of appellate counsel. Attorney Gordon Berris was appointed. According to the circuit court docket sheet (docket # 19), on March 24, 2004, Mr. Berris filed a motion to withdraw the no-contest plea. Judge Fullerton conducted a hearing on the motion on April 5, 2004, and entered an order denying it on the same day. On April 16, 2004, attorney Berris filed an application for leave to appeal, arguing that Judge Fullerton had abused her discretion in denying the motion to withdraw the no-contest plea. The appellate brief argued that petitioner's plea was not knowing and voluntary, because of petitioner's lack of understanding of the English language. By form order entered June 8, 2004, a panel of the Court of Appeals denied the application for leave to appeal "for lack of merit in the ground presented." (Appellate record in case no. 255134, docket # 30). Petitioner filed a *pro se* application for leave to appeal to the Michigan Supreme Court, which was denied by form order entered December 29, 2004. (Appellate record in case no. 126575, docket # 31).

On January 31, 2005, petitioner filed a *pro se* motion for relief from judgment in the trial court. The motion raised three grounds for relief: (1) the trial court mis-scored the state sentencing guidelines on count 5 (first-degree home invasion), the sentence was disproportionate under state sentencing principles, and the trial court inappropriately departed from the guidelines; (2) trial counsel was constitutionally ineffective at sentencing for failing to object to the improper departure; and (3) appellate counsel was constitutionally ineffective for failing to challenge the sentence on appeal.

On February 15, 2005, Judge Fullerton issued a four-page opinion and order denying the motion for relief from judgment. (Attachment to Petitioner's Brief, docket # 3). The trial court found that the claims of sentencing error were meritless, because the sentence was imposed pursuant to a *Cobbs* agreement, entered into by the parties and approved by the court. "The sentences imposed were not based on the guidelines, but on the *Cobbs* agreement." (Op., 3). The court rejected the claim of ineffective assistance of counsel, because petitioner "received the benefit of his bargain, and neither counsel was ineffective in failing to raise challenges to the scoring of the guidelines or to alleged disproportionality of the sentences imposed under these circumstances." (Op., 3). Petitioner sought leave to appeal to the state Court of Appeals. The appeal was initially dismissed for failure to pursue the case in conformity with the rules. (Order of 7/7/05, docket # 32). Petitioner resubmitted his papers, and the state Court of Appeals denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (Order of 4/11/06, appellate case no. 265466, docket # 34). Petitioner asserted the same claims in a *pro se* application for leave to appeal to the state Supreme Court, which denied leave on October 31, 2006, finding that

petitioner "had failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." (Appellate case no. 131320, docket # 35).

Petitioner initiated the present habeas corpus case on January 26, 2007. His *pro se* petition asserts the same four claims raised without success on direct appeal or collateral review.

## Applicable Standard

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v.*

*Metrish*, 556 F.3d 520, 525 (6th Cir. 2009). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied*, 549 U.S. 1308 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005) ("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008).

## Discussion

### A.     Validity of No-Contest Plea

Petitioner challenges the constitutional validity of his no-contest plea on the ground that his lack of understanding of the English language rendered the plea involuntary. The constitutional validity of a guilty plea (or a plea of no-contest) entered in the state courts is to be judged under the due-process standard established by the United States Supreme Court in *Boykin v. Alabama*, 395 U.S. 238 (1969). Under *Boykin*, a guilty plea must be knowing and voluntary in order to withstand scrutiny under the Due Process Clause. A criminal defendant enters a guilty plea knowingly when he understands the nature of the charge, the rights he is giving up, and the direct consequences of the plea. *See Brady v. United States*, 397 U.S. 742, 748 (1970). The longstanding test for determining the validity of a guilty plea is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

A presumption of regularity attaches to final criminal judgments, requiring a petitioner to bear the burden of producing credible evidence that his plea was involuntary. *Parke*

*v. Raley*, 506 U.S. 20, 29-30 (1992). A state plea transcript showing that a plea was voluntary and intelligent is sufficient to invoke the presumption of correctness. *See Garcia v. Johnson*, 991 F.2d 324, 326-27 (6th Cir. 1993). Furthermore, findings of fact made by the trial judge at the conclusion of the plea-taking proceeding are entitled to a presumption of correctness on federal habeas review, rebuttable only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Wright v. Lafler*, 247 F. App'x 701, 705-06 (6th Cir. 2007) (AEDPA case); *Wooten v. Randy*, 112 F. App'x 492, 495 (6th Cir. 2004) ("Factual findings of a state court that a plea was voluntary are accorded a presumption of correctness. . . ."); *Garcia*, 991 F.2d at 326 (pre-AEDPA case).

In the present case, respondent has submitted the transcript of the no-contest plea, as well as transcripts of the preceding and subsequent proceedings in the case. These documents show that in the weeks leading up to the no-contest plea, petitioner appeared in court unaccompanied by an interpreter and addressed the court personally, on numerous occasions, in the English language. Defense counsel had assured the court more than once that petitioner had only minor problems speaking and understanding English. (docket # 23; Tr. at 5; docket # 25, MT at 5-7). Petitioner himself had assured the court that he only needed help with "some law things." (MT 6). When petitioner appeared before the court for the entry of the no-contest plea, petitioner told the court that he understood English but needed help with "some words about the law." (docket # 28, NCT 6). Petitioner did not ask for verbatim translation, nor did defense counsel or the interpreter believe that such was necessary. Nevertheless, the court urged petitioner to tell the interpreter if there were something he did not understand and assured petitioner that the court would stop and have the interpreter translate. (*Id.*). Petitioner responded that he would do so. Thereafter, the court addressed petitioner personally during a lengthy plea colloquy. Petitioner only expressed confusion at two

places. At each instance, the proceedings were halted while petitioner conversed with the interpreter. At the end of each conversation, the court went back to clarify that petitioner understood the matter about which he had expressed confusion. Each time, petitioner stated under oath that he did understand.

At the conclusion of the plea colloquy, Judge Judith Fullerton found that petitioner's plea was made "understandingly, voluntarily, accurately, and knowingly." (NCT 41). She did so after listening to the petitioner's answers in open court and observing his demeanor. These factual findings are entitled to a presumption of correctness, which petitioner must refute by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, petitioner's own statements that he understood English and only needed help with legal terms is binding on him, as are his numerous statements to the court that he understood each of the rights that were being explained to him. *See Fautenberry v. Mitchell*, 515 F.3d 614, 636-37 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008); *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986); *accord United States v. Todaro*, 982 F.2d 1025, 1029 (6th Cir. 1993).

Petitioner has presented no evidence, let alone clear and convincing evidence, to undermine the factual findings of the trial judge. Rather, he presents two arguments, neither of which is meritorious. First, petitioner focuses on the two instances during the no-contest plea in which he showed some confusion or hesitation. In doing so, petitioner fails to view the transcript of that proceeding as a whole. When read as a whole, the transcript clearly demonstrates that petitioner was following the proceedings and that he was required to resort to the interpreter's help only on two occasions. In a similar vein, petitioner focuses on the events at the sentencing hearing, which occurred over one month after the no-contest plea. At the sentencing hearing, petitioner

purported to understand very little. It is common that defendants who have entered a plea of guilty suffer remorse when the day of reckoning approaches. Be that as it may, petitioner's confusion at the sentencing hearing, whether feigned or real, does nothing to undermine the court's conclusion that petitioner understood the proceedings at the no-contest plea hearing one month earlier.

Second, petitioner faults the court for failing to require simultaneous, verbatim translation of the no-contest plea proceedings. This hindsight criticism ignores the fact that the trial judge proceeded in precisely the manner that petitioner and his counsel requested. It is common, in this court and others, that a defendant not completely fluent in English will ask that an interpreter stand by for purposes of helping the defendant with certain words or concepts. This is precisely the assistance that petitioner and his counsel requested of Judge Fullerton, and she complied only after assuring herself that petitioner did not require a higher level of assistance. The Supreme Court has never held that a trial judge taking a plea must override the defendant's express request and insist upon a simultaneous, verbatim translation. Petitioner's claim is therefore not supported by the holdings of any Supreme Court authority, as required by 28 U.S.C. § 2254(d)(1).[2] The only constitutional test is whether petitioner's understanding of English was sufficient for him to comprehend the nature of the charge, the penalties that he faced, and the consequences of his plea. Judge Fullerton's findings that the no-contest plea was knowing and voluntary are amply supported by the plea transcript and are not undermined by petitioner's afterthought contention that he did not

---

[2] Petitioner also makes the accusation that the trial court abdicated its obligation to assure the knowing and voluntary nature of the plea, delegating this duty to the interpreter. This contention is not supported by the record. The court asked the interpreter on only two occasions whether he believed petitioner understood a particular concept. (NCT 22-23; 25-26). In each instance, the court returned to petitioner, going over the very same issues with him personally. The court did not abdicate its role in the plea-taking process.

understand the nature of a no-contest plea, in contradiction to his statements to the court to the contrary under oath.

Petitioner's challenge to the knowing and voluntary nature of his no-contest plea is unsupported and must be rejected.

**B.      Sentencing Issues**

The remaining three habeas corpus claims challenge the validity of petitioner's sentence or the effectiveness of his trial and appellate counsel on sentencing issues.  Respondent's answer raises the defense of procedural default to bar these claims, on the ground that petitioner failed to raise them on direct appeal.  Presumably to overcome the effect of any procedural default, petitioner has filed affidavits of recantation by one of the witnesses against him (Dixon), in support of a claim of actual innocence.  It is not necessary for this court to reach the question of procedural default or the contrived affidavits in support of an actual innocence "gateway" presented in response to the assertion of procedural default.  The district court has discretion to ignore a procedural default and proceed directly to the merits of an apparently defaulted claim, when to do so would be more expeditious than an analysis of the complicated procedural default question.  *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008).   In the present case, petitioner's three remaining claims are indisputably meritless, so analysis of the complicated procedural default issue is unnecessary.

1.      Alleged Sentencing Error

Petitioner's second ground for habeas corpus relief is a confusing mixture of two separate concepts.  First, petitioner asserts that his sentence was based upon materially inaccurate information, in violation of the Fourteenth Amendment as enunciated in *Townsend v. Burke*, 334

U.S. 736 (1948). Second, he makes the unrelated argument that his sentence was based upon improper judicial fact-finding, in contravention of his Sixth Amendment right to trial by jury, as recognized in *Blakely v. Washington*, 542 U.S. 296 (2004). Neither challenge is meritorious.

Petitioner's claim that his sentence was based upon inaccurate information suffers from numerous, fatal flaws. Discussion of only two will suffice. First, the "inaccurate information" relied upon by petitioner is not factual information, but allegedly inaccurate scoring under the state sentencing guidelines. This frames a purely state-law issue. Habeas corpus relief is limited to violation of a petitioner's rights under the federal Constitution or laws. 28 U.S.C. § 2254(a). Habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Consequently, a Michigan judge's decisions under the state sentencing guidelines are matters of state law alone and do not raise a federal issue. *See Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1898 (2008); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) (State court's interpretation and application of its sentencing guidelines "is a matter of state concern only."). Moreover, it is clear that Judge Fullerton's sentence was not based upon the state sentencing guidelines. In the state circuit court's opinion and order denying petitioner's motion for post-judgment relief, Judge Fullerton found that the sentences that she imposed "were not based on the guidelines, but on the *Cobbs* agreement." (Op. at 3). Petitioner's guilty plea was accompanied by an agreement for a specific sentence, which the trial court adhered to at the time of sentencing. Therefore, any alleged mistake in calculating the state sentencing guidelines was immaterial to the sentence.

Petitioner's Sixth Amendment challenge under *Blakely* is likewise meritless. In *Blakely*, the Supreme Court found that the Washington State determinate sentencing scheme,

pursuant to which a defendant's maximum sentence could be enhanced by judicial fact-finding, violated the Sixth Amendment right to trial by jury. The *Blakely* Court was careful to note, however, that indeterminate sentencing schemes do not afoul of this principle. 542 U.S. at 308-09. Michigan has just such an indeterminate sentencing scheme. The maximum sentence is not determined by the trial judge but is set by law. *See People v. Drohan*, 715 N.W.2d 780, 790 (Mich. 2006). The sentencing judge chooses only a minimum sentence, within the range suggested by the state sentencing guidelines. *Id.* at 790. Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *Id.* The Sixth Circuit has now authoritatively held that a Michigan trial judge's fact-finding to set a minimum sentence does not violate a defendant's Sixth Amendment rights under *Blakely*. *See Chontos v. Berghuis*, No. 08-1031, ___ F.3d ___, 2009 WL 3734675 (6th Cir. Nov. 10, 2009).

In short, all of petitioner's substantive challenges to his sentence are clearly meritless.

2.  Ineffective Assistance of Counsel

Petitioner challenges the effectiveness of his trial counsel, who failed to object to the sentence imposed, and of his appellate counsel, who failed to raise the issue on direct appeal. Under *Strickland v. Washington,* 466 U.S. 668 (1984), petitioner has the burden of showing both that his counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice, resulting in an unreliable or fundamentally unfair outcome. 466 U.S. at 687-88. On post-judgment review, Judge Fullerton applied this standard, finding that neither trial nor appellate counsel "was ineffective for failing to raise these challenges to the scoring of the guidelines or to allege disproportionality of the sentences" because both issues were meritless. Judge Fullerton found

that petitioner had been sentenced in strict accordance with his *Cobbs* agreement and therefore had no meritorious challenge to the sentence. (Op. at 3). On habeas corpus review, this court can grant relief only if it finds that Judge Fullerton's decision was contrary to, or was an unreasonable application of, the *Strickland* standard. *See Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Hodge v. Haeberlin*, 579 F.3d 627, 642 (6th Cir. 2009).

Petitioner cannot possibly show that the performance of his trial or appellate counsel fell below an "objective standard of reasonableness" in failing to challenge the agreed upon sentences. As found in section B.1. above, petitioner's federal challenges to his sentence are meritless, so any objection by counsel on that ground would have been fruitless. Furthermore, the state Supreme Court has pointedly held that a criminal defendant sentenced pursuant to a sentencing bargain "must expect to be denied relief" on any appeal challenging the sentence on state-law grounds. *Cobbs*, 505 N.W.2d at 213. In the present case, the sentence imposed by the Genesee County Circuit Court was the product of a sentence bargain, not judicial fact-finding, interpretation of state sentencing guidelines, or any other judicial act. Petitioner cannot possibly allege error in the formulation of his sentence, and any trial court or appellate objection would have been futile. An attorney's failure to raise futile or clearly meritless claims is not the ineffective assistance of counsel. *See Webb v. Mitchell*, No. 06-4606, ___ F.3d ___, 2009 WL 3644249, at * 13 (6th Cir. Nov. 5, 2009); *Evans v. Hudson*, 575 F.3d 560, 566 (6th Cir. 2009).

Petitioner's challenges to the constitutional validity of his sentence and to his trial and appellate attorney's effectiveness with regard to sentencing issues fail to establish any ground for federal habeas corpus relief.

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied on its merits.

Dated:   November 23, 2009          /s/  Joseph G. Scoville
                                    United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).